United States Court of Appeals
Fifth Circuit

**F I L E D**

June 29, 2005

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 02-21225
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JULIO CESAR VALENCIA-QUINTANA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas, Houston
USDC No. 4:92-CR-270-2

_____

Before JOLLY, HIGGINBOTHAM, and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[1]

The appellant, Julio Cesar Valencia-Quintana ("Valencia"), a citizen of Colombia, was convicted and sentenced to life imprisonment for his role (a major role, to be sure) in a conspiracy to import approximately 400 kilograms of cocaine into the United States. Valencia was indicted after an undercover investigation by DEA agents. At trial, the agents and a paid informant testified that Valencia actively solicited them as drug couriers, procured the cocaine, arranged the pick-up, and provided

_____

[1]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

their compensation. Finding no reversible error, we AFFIRM Valencia's conviction and sentence.

I

Of the eight points of error Valencia raises, only one -- his Sixth Amendment speedy trial argument -- warrants discussion. Thus, we set forth in some detail the facts relevant to that issue.

In 1991, the DEA was engaged in an undercover investigation of an international drug smuggling operation. As part of that investigation, DEA agents posed as drug smugglers capable of transporting large quantities of narcotics into the United States. The agents were introduced to Valencia, who indicated that he was interested in procuring their services.

After several months of negotiations, Valencia and the undercover agents agreed upon a plan to transport several hundred kilograms of cocaine into the United States. In May 1991, the officers flew to an airstrip in Guatemala using coordinates provided by Valencia, picked up 410 kilograms of cocaine, and returned to Corpus Christi. Four days later, as the cocaine was being driven to Houston, law enforcement officers seized it in a staged traffic stop.

In 1992, Valencia was indicted and charged with conspiracy to import narcotics into the United States, in violation of 21 U.S.C. §§ 952(a), 960(b)(1)(B)(ii), and 963. During the investigation following the indictment, however, it was learned that Valencia had been arrested in July 1991 by authorities in the Dominican Republic

2

on charges relating to the importation of cocaine into that country.  Dominican authorities denied the DEA's request to have Valencia released into United States custody, but informally agreed to notify the DEA prior to his release.  After this agreement was reached, DEA officials began inquiring into Valencia's status every six to nine months, but no formal extradition request was ever filed.

In January 2000, the DEA began attempts to locate Valencia in the Dominican prison system using marshals stationed in the Dominican Republic.  The search was slowed by the fact that prisoners could only be identified by physically entering the prisons and reading handwritten notes placed on cards assigned to each prisoner.  In October 2001, DEA officials learned that Valencia had received a presidential pardon and had been released and deported to Colombia in December 1999.  It was also learned that Valencia had been held as a non-sentenced prisoner, meaning that he was never convicted of a crime.

In October 2001, the DEA discovered that Valencia recently had been re-arrested by Dominican authorities for attempting to deposit counterfeit money into a bank account that he controlled in that country.  The DEA secured an agreement from Dominican officials that they would expel Valencia from the country as an "undesirable."  He was placed on a flight to Colombia with a stopover in Miami, Florida.  Upon arrival in Miami on October 18, 2001, Valencia was taken into United States custody.

Valencia received appointed counsel on November 29, 2001, and filed a motion to dismiss the indictment for violation of the Sixth Amendment right to a speedy trial on December 21, 2001. After a hearing on this motion, the district court found that Valencia's Sixth Amendment right had not been violated by the delay between his initial indictment and his arrest by United States authorities.

The case proceeded to trial and a jury found Valencia guilty in May 2002. The district court sentenced Valencia to life imprisonment on each count, to be served concurrently.

II

Valencia contends that the nearly nine-year delay between his indictment in 1992 and his arrest in 2001 violated his Sixth Amendment right to a speedy trial. We review the district court's determinations regarding speedy trial violations for clear error. See United States v. Cardona, 302 F.3d 494, 497 (5th Cir. 2002).

To determine whether a defendant's right to a speedy trial has been denied, we apply a four-factor test derived from the Supreme Court's opinion in Barker v. Wingo, 407 U.S. 514 (1972). The relevant factors are "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's diligence in asserting his Sixth Amendment right, and (4) prejudice to the defendant resulting from the delay". United States v. Cardona, 302 F.3d 494, 496 (5th Cir. 2002) (citing Barker, 407 U.S. at 530-33).

The first factor, length of delay, is a "triggering mechanism" for determining whether the court is required to balance the

4

remaining three factors.  We previously have held that a one-year delay is sufficient to warrant judicial examination of a speedy trial claim.  See United States v. Bergfeld, 280 F.3d 486, 488 (5th Cir. 2002); see also Doggett v. United States, 505 U.S. 647, 652 n. 1 (1992).  In this case, the parties agree that the overall delay runs from Valencia's indictment in 1992 until his arrest in 2001.  Accordingly, we must analyze the remaining three Barker factors.

Our analysis hinges, to a large extent, on the second factor: the reason for the government's delay in prosecuting Valencia.  As explained supra, the first seven years of the delay in this case resulted from Valencia's arrest and incarceration in the Dominican Republic.  As such, Valencia acknowledges that only the remaining two years -- i.e., the period beginning with his release from Dominican custody in December 1999 and ending with his arrest in October 2001 -- are even arguably attributable to a lack of diligence on the part of the government.

Nonetheless, Valencia contends that the remaining two-year delay was the product of government negligence.  Valencia argues that the government was negligent in failing to file a formal request for extradition, which ostensibly would have permitted United States authorities to apprehend Valencia immediately upon his release from Dominican custody.  We do not agree.

Although the government did not formally request extradition, the United States did procure an agreement from Dominican officials to notify the DEA prior to Valencia's release.  Not content to rely

5

exclusively on this agreement, the DEA made regular inquiries into Valencia's status throughout his incarceration, a task made significantly more difficult by the Dominican Republic's antiquated and unreliable record-keeping system.  In October 2001, the DEA learned that Valencia had obtained release via a presidential pardon, and that the Dominican authorities had failed to provide the promised notice.  Later that month, upon receiving information that Valencia had again been arrested in the Dominican Republic, the DEA secured an agreement with Dominican authorities by which he would be expelled and subsequently arrested.

In sum, the final two years of delay in this case cannot be attributed to negligence on the part of the government.  Although it may be arguable -- but by no means certain[1] -- that the government could have pursued a more aggressive means of securing Valencia for trial, its efforts to that end were reasonably diligent.  As such, we conclude that the second Barker factor weighs heavily against a finding that Valencia's right to a speedy trial has been violated.

We need not dwell long on the third Barker factor -- i.e., the defendant's diligence in asserting his Sixth Amendment right.  The record contains no evidence that Valencia was aware of the charges

---

[1] As the government notes, given (1) the Dominican Republic's failure to comply with the informal notification agreement, and (2) the poor record-keeping practices of Dominican prisons, there is no reason to assume that Dominican authorities would have successfully carried out their obligations under a formal extradition agreement.

pending against him in the United States prior to his arrest in Miami. Thus, his failure to assert his right to a speedy trial until roughly one month after his capture by United States authorities, and nine years after his initial indictment, is not taxed against him.

As to the final factor in the <u>Barker</u> analysis -- whether the delay has prejudiced the defendant -- Valencia concedes that he can identify no specific instance of prejudice flowing from the delay. He argues, however, that the length of the delay in this case entitles him to a presumption of prejudice.

When evaluating a defendant's claim that prejudice should be presumed,

> the Supreme Court has held that if the government diligently pursues a defendant from indictment to arrest, prejudice will never be presumed. In contrast, if the government acts in bad faith, i.e., intentionally holds back in its prosecution of the defendant to gain some impermissible advantage at trial, the delay will weigh heavily in favor of the defendant. If a case involves neither diligent prosecution nor bad faith delay but instead official negligence, the case occupies a "middle ground" where the weight assigned to the factor increases as the length of the delay increases. A court's toleration of such negligence varies inversely with its protractedness.

United States v. Serna-Villareal, 352 F.3d 225, 232 (5th Cir. 2003)(internal quotations omitted). In this case, although the two years of delay not directly attributable to Valencia's incarceration in the Dominican Republic are not insignificant, the

7

government's diligence in pursuing Valencia and the lack of any evidence of bad faith preclude a presumption of prejudice.

In sum, although the nine-year delay between Valencia's indictment and arrest was indeed substantial, the causes of that delay -- i.e., Valencia's incarceration and the unpredictable nature of the Dominican penal system -- weigh heavily against a finding that Valencia's right to a speedy trial has been violated. We therefore hold that the district court did not clearly err in denying Valencia's motion to dismiss for violation of his Sixth Amendment right.

### III

With respect to the other issues raised in Valencia's appeal, we have reviewed the briefs and the record, and have concluded that the district court committed no reversible error.[2] Accordingly, the judgment of the district court is, in all respects,

AFFIRMED.

---

[2] Valencia contends that the district court erred in (1) admitting two telephone calls and a facsimile into evidence without proper authentication; (2) failing to overrule an objection to the prosecutor's remarks in closing argument regarding the credibility of a witness; (3) assessing a two-level upward departure in his sentence for the use of a non-commercial aircraft in the importation of the cocaine; and (4) relying upon information in the pre-sentencing report as a basis for assessing a three-level upward departure for Valencia's managerial role in the importation operation. Valencia also raises two issues for the first time on appeal: an objection to his sentence under United States v. Booker, _____ U.S. _____, 125 S. Ct. 738 (2005), and a Fifth Amendment challenge based on "outrageous government conduct".